Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

|  |  |
|---|---|
| DAVID C. and J.C.,<br><br>              Plaintiffs,<br><br>vs.<br><br>ANTHEM BLUE CROSS and BLUE SHIELD,<br><br>              Defendant. | AMENDED COMPLAINT<br><br>Case No. 1:25-cv-00058-JNP-CMR<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiffs David C. ("David") and J.C., through their undersigned counsel, complain and

allege against Defendant Anthem Blue Cross and Blue Shield ("Anthem") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. David and J.C. are natural persons residing in Fulton County, Georgia. David is J.C.'s

    father.

2. Anthem is the trade name of Blue Cross Blue Shield Healthcare Plan of Georgia, an

    independent licensee of the nationwide Blue Cross and Blue Shield network of providers.

1

Anthem was the insurer and claims administrator, as well as the fiduciary under ERISA, for the insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

3. The Plan is a fully insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). David was a participant in the Plan and J.C. was a beneficiary of the Plan at all relevant times. David and J.C. continue to be participants and beneficiaries of the Plan.

4. Plan participants and beneficiaries were told that Anthem was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.

5. At all relevant times, Anthem acted as the agent for both the Plan and the Plan Administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.

6. J.C. received medical care and treatment at Daniels Academy ("D.A.") from May 25, 2022, to April 7, 2023, and Elevations RTC ("Elevations") from April 20, 2023, to May 10, 2024. During the timeframe at issue in this case, these were treatment facilities located in Box Elder County Utah and Davis County Utah, respectively, which provided sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7. Anthem initially denied claims for payment of J.C.'s medical expenses in connection with his treatment at D.A. and Elevations. Subsequently, the parties resolved the claims related to D.A.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah through its network of affiliates, and the treatment at issue took place in Utah.

10. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and J.C.'s privacy will be preserved.

11. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### J.C.'s Developmental History and Medical Background

12. J.C. was often behind on developmental milestones as a child, and his pediatrician recommended early intervention programs. J.C. was treated at one of these programs

until he aged out. J.C. fell behind in preschool and his entry into kindergarten was delayed.

13. J.C.'s conduct and developmental delays became more concerning as he grew older. He was diagnosed with dyslexia and ADHD. When J.C. didn't want to do something at school, he would exhibit age-inappropriate behaviors such as dropping to the ground and writhing around, frequently losing his shirt in the process. He also often had anger outbursts.

14. J.C. was suspected to be on the autism spectrum although the tests were generally inconclusive due to J.C.'s refusal to participate. J.C. was formally diagnosed with the condition in the fourth grade and began attending a different school with better resources to assist children with special needs. J.C. continued to act out at this new school and was suspended twice. J.C. then switched schools again.

15. J.C.'s behaviors ramped up significantly around the time that he was in sixth grade. He threatened to kill himself and was hospitalized for a week. He made threats of self-harm and was taken out of school. J.C. did poorly in his online classes and then began attending private school.

16. He continued to threaten to kill himself and as he transitioned to high school. J.C. would frequently become combative and destructive. J.C. began attending an intensive outpatient program but was expelled shortly afterwards.

17. He tried to run away from home and was found by police. He continued to threaten suicide and was again hospitalized and then sent to a partial hospitalization program but was again asked to leave due to disruptive behaviors.

18. J.C. was suspended from school after another student saw him rubbing himself while looking at pornographic images. J.C. was suspended after threatening the student. He was often angry and dysregulated and would yell and throw things frequently.

19. J.C.'s school counselors recommended residential treatment, and D.A. accepted him.

**D.A.**

20. J.C. was admitted to D.A. on May 25, 2022.

21. In a letter dated April 23, 2024, Anthem denied payment for J.C.'s treatment at D.A.

22. David appealed the adverse decision and provided Anthem with letters of medical necessity from some of J.C.'s treating providers . In an undated letter Laura Finnell, M.Ed, and Kyle Jarcynski, M.Ed. wrote in part:

> We served as the High School Principal team during [J.C.]'s 9th grade year at The Cottage School. [J.C.] was under our care and supervision from August 2021 to February 2022, at which time he withdrew from our school to transition to a residential placement. We discussed the option of a residential program at that time due to [J.C.]'s continued struggles and unwillingness/inability to employ any of our attempted interventions and strategies.
>
> The Cottage School specializes in teaching students with learning disabilities and special needs using an Applied Behavioral Analysis model, and we have been in operation for almost 40 years. We have a 1:10 teacher-to-student ratio and every student receives individualized accommodations based on their needs. We have extensive experience guiding students who struggle with anxiety, avoidance, and other barriers that inhibit academic and social success. Unfortunately, we were unable to help [J.C.] function in our alternative and supportive high school environment. in breaking his patterns of avoidance. In fact, his concerning behaviors increased in severity throughout his time with us. We recognized that he needed a more intensive and therapeutically-supportive program, given his lack of progress at school and at home. Below is an incomplete list of some of the concerning behaviors that we saw from [J.C.] in his 9th grade year:
> • Somatic symptoms, including Psychogenic Nonepileptic Seizures
> • Age-inappropriate coping strategies, including crawling under desks and tables and refusing to come out
> • Petting an imaginary cat
> • Verbal and physical outbursts when frustrated
> • Threatening self-harm with a compass

• Loss of physical self-control, including throwing a compass at a teacher and shoving a desk
• Inability to inhibit impulses, including looking at pornographic images in class and touching himself inappropriately
• Threatening the safety of others, including drawing pictures that depicted him physically hurting another student

Throughout his time with us, we stayed in close communication with his family and psychiatrist. We attempted to encourage age-appropriate behavior and healthy coping strategies, but [J.C.] continued to rely on his maladaptive coping strategies and was unwilling/unable to try our suggestions. We shifted [J.C.] to less rigorous courses, allowed him extra time to complete assignments, and scheduled 1-on-1 time with teachers and administrators, all in an attempt to give him the academic support he needed. All of these were unsuccessful, so it was clear to us that [J.C.] needed a more restrictive environment and additional therapeutic support.

23. In another letter dated October 27, 2023, Tamara Ancona, MA, LPC, CLPS, wrote in

part:

To begin with, it is important to note that a residential therapeutic intervention is often used when the local infrastructure is no longer able to successfully accommodate and support the mental health needs of the struggling student. In [J.C.]'s case, it is reported that he had many outpatient support services, learning support and school changes through the years. He faced multiple developmental obstacles at a young age, which manifested into complex social, behavioral, emotional and familial challenges. It was in Junior High that he was first hospitalized at an acute care mental health facility and when things began to uproot for him even more so. His struggles gradually were evidenced throughout these school years with behaviors escalating both within and out of the home, despite Mr. & Mrs. [C.]'s efforts for providing him with the necessary local psychiatric, therapeutic and educational interventions. A partial hospitalization program was sought, ultimately to help [J.C.] stabilize in a home setting and to engage in the therapeutic programming with success in hopes to bypass residential treatment. Unfortunately his lack of compliance with the structure of the program caused a premature discharge and his escalated behaviors warranted a subsequent hospitalization. At this point, appropriate local treatment had been accessed, exhausted or repeated and any treatment intervention beside residential would have placed [J.C.] in the highest risk category for continued failure and disruption to his developmental growth and to his safety and that of his family.

The following licensed residential therapeutic programs were recommended as a next step for [J.C.]: Daniels Academy (Utah), Logan River Academy (Utah), Heritage RTC (Utah) and Maple Lake Academy (Utah). Each offered

a combined therapeutic approach (individual, group, family) with an appropriate milieu component and structured academics. They had specific tracks/programming for those students on the Autism Spectrum, which [J.C.] was and is. A comprehensive model that emphasized therapeutic proficiency with working with adolescent neuro-atypical boys with issues of interpersonal relations (parent-child, family, peers), behavioral choices, distress tolerance, emotional regulation, anxiety, mood irregularity, identity development, family distress, attention and processing difficulties and age- appropriate individuation was of primary focus. It was also imperative that this setting serve a high school population. Helping him stabilize, regulate, integrate and learn social integration and eventually reunify with his family were also inclusive of his placement goals.

After thorough research, campus visits, consultations and professional collaboration, the [C. family] selected Daniels Academy for [J.C.] to attend. He arrived at Daniels Academy in May 2022. The hopes were over the course of the next 12-16 months, Daniels Academy would provide the landscape of learning necessary for [J.C.] to begin to understand the connection between life's changes and his emotions and his choices; foster skill development around adaptability, daily living and coping; and create a foundation that is sustainable at this stage of his development and beyond. He attended Daniels until June 2023, whereby he progressed in his unique ways with school engagement, emotional regulation, cognitive flexibility, family relations and interpersonally.

24. In a psychological evaluation conducted in late 2022 and early 2023 Nicole Stewart,

Ph.D. wrote in part:

> [J.C.] has made slow but clear progress in his time at Daniel's. His aggressive behaviors have decreased considerably and he is becoming more willing to engage in activities that he doesn't enjoy (such as testing). [J.C.]'s profile suggests that he will be slow to respond to treatment and will need more time than many of his peers to make lasting changes simply due to the marked rigidity he presents with. Further, individuals with ASD are known to have difficulty with generalization of skills, meaning that just because [J.C.] has mastered certain skills in one setting does not mean that he will automatically use those skills in another setting. Thoughtful and systematic support to enhance generalization will be necessary through increased opportunities in the community, access to volunteer opportunities and eventually work, and highly-supported home visits, which all allow [J.C.] to practice his new skills in other environments. It is recommended that [J.C.] and his treatment team work closely to achieve these ends and that [J.C.]'s treatment at Daniel's not be dependent on specific timelines, but rather, on the achievement of specific goals, generalized across settings

> Individual therapy is an important part of [J.C.]'s treatment, though [J.C.]is

7

> unlikely to respond to traditional talk-therapy. Rather, he will need hands-on, experiential-based treatment methods that help him develop insight by doing. More concrete methods such as cognitive-behavioral methods are more likely to be helpful for [J.C.] so he can begin to make connections between his thoughts, feelings, and behavior.
>
> Because [J.C.] is taking psychotropic medications, the ongoing participation of a psychiatrist on his treatment team is important to ensure that [J.C.] is receiving maximum benefit from medication while minimizing side-effects.

25. David wrote that it was the clear opinion of all of J.C.'s treatment providers that his treatment was necessary and appropriate. He stated that he found it concerning that Anthem would attempt to supersede the opinions of the individuals who had worked with J.C. on a firsthand basis and actively witnessed the deterioration of his conditions.

26. David also provided Anthem with copies of J.C.'s medical records. These records included instances of J.C. throwing items like rocks, chairs, and plates, being physically restrained, property destruction, being aggressive towards others, and difficulty regulating emotions.

27. The records also documented an incident where J.C. attempted to stab D.A.'s program director from behind with a sharpened toothbrush on April 6, 2023. J.C. was then asked to leave D.A. after this incident.

28. Subsequent to the filing of the Complaint in this case, the parties resolved the claims regarding D.A and Anthem covered the care J.C. received at D.A.

29.

**Elevations**

30. Following discharge from D.A., J.C. was admitted to Elevations on May 20, 2023. Anthem approved the initial stages of this treatment up to June 5, 2023.

31. In a letter dated June 8, 2023, Anthem denied further payment for J.C.'s treatment. The letter was essentially word for word identical to the April 23, 2024, letter for D.A. it stated in relevant part:

> The request tells us you went to a residential treatment center for your mental health condition. The program asked to extend your stay. The plan clinical criteria considers ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self-care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show you are a danger to yourself or others or that you are having serious problems functioning. For this reason, the request is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

32. On November 27, 2023, David submitted an appeal of the denial of payment for J.C.'s treatment at Elevations. David asked for the full, fair, and thorough review to which he was entitled under ERISA. He asked that the reviewer have experience treating individuals with J.C.'s diagnoses, and that they be trained in the details of MHPAEA to respond to his allegations concerning a violation of the statute.

33. He again noted his concerns that Anthem had deemed J.C.'s care as not medically necessary without citing to any specific clinical evidence. He asked the reviewer to make direct references to the medical records they had relied upon to determine the medical necessity of J.C.'s care and reminded Anthem that it had an obligation to act in his best interest.

34. David again alleged that Anthem was employing the MCG criteria in a manner that violated generally accepted standards of medical practice. David argued that the criteria demonstrated J.C.'s care was necessary when they were applied properly.

35. David argued that J.C. did not yet meet the MCG criteria for discharge and he asserted that Anthem's reviewer had no clinical justification for denying payment and had not provided any evidence to support their findings.

36. He again alleged a violation of MHPAEA by Anthem making subacute residential treatment contingent on individuals not being a danger to themselves or others. He contended that Anthem did not make acute conditions like this a requirement for analogous medical or surgical care. He asked Anthem to perform a MHPAEA compliance analysis to ensure the Plan was being administered in accordance with the statute.

37. David included copies of J.C.'s medical records with the appeal. These records showed issues which included medication refusal, hallucinations, chronic anger, J.C. "black[ing] out and doesn't remember his dysregulation," property destruction, threats of violence, and panic attacks.

38. David wrote that J.C.'s treatment at Elevations was necessary to provide him with a safe and effective environment which would allow him to be successfully treated in lower levels of care going forward.

39. David wrote that Anthem had authorized payment for services for dates between April 20, 2023, and June 5, 2023, but it had paid at a reduced rate of about 54.5% of the billed charges. He asked Anthem to produce "clear and detailed documentation describing the

exact methodology used" to calculate the amount it had authorized. He again asked for a copy of the Plan Documents.

40. David did not initially receive a response to this appeal until he filed a complaint with Georgia's insurance commissioner.

41. In a letter dated February 9, 2024, Anthem again denied payment for J.C.'s treatment. The letter was once again functionally identical to the initial D.A. denial and Anthem's more recent June 8, 2023, letter and stated that payment had been denied as:

> The request tells us you went to a residential treatment center for your mental health condition. The program asked to extend your stay. The plan clinical criteria considers [sic] ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self-care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show you are a danger to yourself or others to the degree that continued treatment at residential level of care is required. For this reason, the request is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

42. Additionally, in a letter dated April 30, 2024, Anthem upheld the denial of payment for J.C.'s treatment. The letter stated that the denial was upheld as:

> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to stay longer in residential treatment center care. You were getting this because you had been at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record plus letters. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason: after the treatment you had, you are no longer at risk for serious harm that you need 24 hour care. You could be treated with outpatient services.

11

> We based this decision on the MCG guideline Residential Behavioral Health
> Level of Care, Child or Adolescent (ORG: B-902-RES).[1]

43. The April 30, 2024, letter stated that the reviewers were board certified in psychiatry and that Plaintiffs could visit Anthem's website or call it to obtain the documentation they had requested.

44. Anthem attributed its denial letters to unidentified "experienced healthcare professional[s]." As many of the denial justifications are functionally word for word identical to each other, it is unclear whether Anthem reused reviewers or if the reviewers simply copy and pasted the previous denial rationales.

45. On July 29, 2024, David asked for the denial of payment for J.C.'s treatment to be evaluated by an external review agency. David continued to assert that J.C.'s treatment was medically necessary.

46. He continued to allege that Anthem failed to maintain an adequate network of treatment providers for residential care, especially compared to analogous medical or surgical providers in the same radius. He shared documentation from Milliman Inc., the U.S. Department of Labor, and the U.S. Government Accountability Office about disparities in provider availability between mental health and medical care.

47. David argued that because an appropriate in-network provider was not available, J.C.'s coverage should have qualified at the in-network level.

48. David included updated copies of J.C.'s medical records with the appeal and asked the reviewer to disclose the specific clinical evidence they relied upon to come to their decision.

---

[1] This, along with some other portions of the letter, are in red text. The red text seemingly was left in inadvertently when the letter author made changes to a template.

49. In a letter dated September 17, 2024, Anthem approved coverage for dates of service between May 1, 2024, and May 10, 2024. The letter gave no indication why these dates had been overturned yet the other denials were allowed to stand.

50. In a letter dated November 5, 2024, review agency Advanced Medical Reviews upheld the denial of payment for J.C.'s treatment. The reviewer wrote that the treatment was not medically necessary as:

> Based on current peer-reviewed, evidence-based medical literature, the requested treatment (continued behavioral health residential treatment level of care from 06/06/2023 through 05/10/2024) was not found to be medically necessary. There is no evidence that provision of the treatment, in whole or in part would reasonably be expected to be held beneficial to the patient and with holding [sic] the treatment, in whole or in part, would reasonably be expected to affect the patient's health adversely. The clinical information provided does not indicate that the service requested was the least restrictive setting that was medically necessary or that was likely to be successful in treating the patient's symptoms (1-8). ...
>
> The clinical information reviewed indicates that the patient had no significant ongoing behavioral health symptoms that required 24-hour medical and nursing monitoring as of 06/06/2023. The patient was not reported to have any suicidal or homicidal ideations or found to be at risk of harm to self or others. He was noted to have intermittent episodes of irritability, impulsive and mood dysphoria which were noted to be his baseline and did not represent a significant change. The patient was not reported to have any symptoms suggestive of psychosis including hallucinations, delusions, or paranoia. He was not reported to have any significant symptoms suggestive of mania or hypomania. He was not reported to have exhibited any significant and persistent agitation or aggressive behavior. The patient was not reported to have engaged in any self-injurious behaviors recently and was not reported to have any significant urge [sic].
>
> The patient was not reported to have any significant ongoing medical conditions that required intervention or monitoring. He was not reported to have any significant adverse effects from any prescribed psychotropic medications. There was no indication that the patient had any unstable vital signs or abnormal biochemical parameters. There was no indication that the patient was unable to maintain an adequate body weight. The patient was not reported to have significant functional impairments including age-appropriate activities of daily living or self-care that represented a change from his baseline functioning. He was not reported to have any significant barriers to treatment in the community including severe ongoing psychosocial stressors, unsafe living environment or lack of social support. The clinical information provided does not indicate that the patient continued to exhibit improvements in behavioral symptoms with ongoing

treatment at the behavioral health residential treatment level of care. The patient may have been treated safely and effectively in a less restrictive setting and lower level of care such as continued outpatient treatment.

51. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

52. The denial of benefits for J.C.'s treatment was a breach of contract and caused David to incur medical expenses that should have been paid by the Plan in an amount totaling over $210,000.

53. Anthem failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite David's requests.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

54. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

55. Anthem and the Plan failed to provide coverage for J.C.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

56. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal

14

process. 29 U.S.C. §1133(2).

57. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a meaningful analysis of the David's appeals or whether it provided him with the "full and fair review" to which he is entitled.

58. Anthem failed to substantively respond to the issues presented in David's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

59. In fact, many of Anthem's letters (even across different facilities) were word for word identical to each other, despite David's frequent and repeated requests for more information.

60. Anthem made no effort to clarify why it had approved some dates of service and denied others, and did not specify what changes in J.C.'s condition led Anthem to deny payment.

61. The services Anthem did pay were approved at an artificially low amount and were further reduced due to David being forced to seek out-of-network care due to Anthem's failure to maintain an adequate offering of in-network residential treatment providers.

62. Anthem and the agents of the Plan breached their fiduciary duties to J.C. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in J.C.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of J.C.'s claims.

63. The actions of Anthem and the Plan in failing to provide coverage for J.C.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

64. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

65. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

66. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

67. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

68. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of

16

benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

69. The application of the medical necessity criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the application of the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

70. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for J.C.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

71. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

72. Anthem and the Plan evaluated J.C.'s mental health claims employing medical necessity criteria in a manner that deviates from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

73. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Anthem's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that J.C. received. Anthem's improper use of acute inpatient medical necessity criteria is revealed in the statements in Anthem's denial letters such as:

> The plan clinical criteria considers ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by

hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care).

74. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that J.C. received.

75. The Plan does not require individuals receiving treatment at subacute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

76. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

77. The denial letters also state that care could be denied due to "serious problems with functioning," but Anthem's denial letters never go into enough detail to determine why it actually denied payment.

78. Anthem stated, "you are no longer at risk for serious harm that you need 24 hour care" but gave no evidence to support this, and did not point to any changes in J.C.'s condition to show why it approved coverage for some dates of service and then denied others.

79. Anthem cited to outside criteria to support its decision, but despite David's assertion that J.C. met these criteria, and did not yet meet the discharge criteria, Anthem failed or was unable to identify any particular criterion which was not met.

80. In addition, for residential treatment facilities providing mental health and substance use disorders, Anthem and the Plan fail to provide a comparable degree of network

residential treatment facilities compared to the degree of network skilled nursing and inpatient rehabilitation facilities.

81. The failure by Anthem and the Plan to provide adequate network facilities for sub-acute inpatient treatment of mental health and substance use disorders compared to the network facilities for sub-acute inpatient treatment of medical and surgical disorders resulted in a coverage disparity that violates MHPAEA.

82. This failure to maintain an adequate network of residential providers harmed the Plaintiffs by compelling them to seek out-of-network care to properly address J.C.'s mental health issues.

83. As Anthem failed to provide much of the documentation David requested, David is hindered from asserting a MHPAEA claim with more specificity and directly identifying all the ways Anthem's conduct prejudiced him in a manner that may violate the statute.

84. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

85. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan because of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiff for his loss arising out of the Defendant's violation of MHPAEA.

(i) An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

86. The remedies the Plaintiffs seek under MHPAEA are not available under ERISA even if they are successful in obtaining remedies for wrongful denial of the Plan benefits.

87. For example, declaratory relief, reformation of the medical necessity criteria, or an order requiring adequacy of network facilities eligible for coverage of residential treatment for

20

mental health and substance use disorders are not available as remedies for a wrongful denial of plan benefits.

88. Similarly, an order stating that the Defendants violated MHPAEA by applying acute care criteria to treatment provided in a sub-acute treatment setting is not available as a remedy for wrongful denial of Plan benefits.

89. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C.§(a)(1)(B).

90. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1.      Judgment in the total amount that is owed for J.C.'s medically necessary treatment at Elevations under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

DATED this 9th day of February, 2026.

By     s/ Brian S. King
                    Brian S. King
                    Attorney for Plaintiffs

County of Plaintiffs' Residence:
Fulton County, Georgia

21